IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Melissa Avery,                                        Case No. 3:06CV1497

                Plaintiff

      v.                                             ORDER

Joint Twp. Dist. Mem'l Hosp.,

                Defendant


      Plaintiff, Melissa Avery, sues her former employer, Joint Township District Memorial Hospital, where Avery worked from December, 2002, to December, 2004, as a part-time registered nurse. Avery alleges that the hospital wrongfully terminated her for refusing to alter medical records relating to a November, 2004, delivery of an infant at the hospital.

      The hospital claims it rightfully terminated Avery for performance-related reasons, namely: advertising her outside day spa business to hospital patients, using the hospital's telephone during work hours to manage the day spa, providing medical advice to a patient over the telephone, lying about the reason she needed to cancel a work shift, and disclosing confidential patient information in violation of the hospital's policies and the Health Insurance Portability and Accountability Act ("HIPAA") (Pub.L. 104-191, 110 Stat 1936 (1996) (codified as amended in various sections of 18, 26, 29, 42 U.S.C.)).

      Jurisdiction exists under 28 U.S.C. § 1332(a)(1).

1

Avery raises three claims: 1) wrongful discharge in violation of public policy, 2) fraud, and 3) intentional infliction of emotional distress.[1]

Pending is the hospital's motion for summary judgment. For the following reasons, that motion shall be granted.

## I. Background

On or about December 3, 2002, defendant Joint Township District Memorial Hospital, located in St. Marys, Ohio, hired Avery to work as a part-time registered nurse. For two years, Avery, an at-will employee, worked about sixteen hours per week in the Labor and Delivery/Women's Services Department under the supervision of Diane Wagner, Director of Women's Services.

In the Labor and Delivery department, Avery assisted doctors and midwives before, during, and after the delivery of infants. Nurses' responsibilities during deliveries include, *inter alia:* monitoring the vital signs of the mother and baby, documenting the progress of the labor, administering medications, initiating IV access, recording the time of birth, evaluating the mother's post-delivery condition, and helping the doctor or midwife assess the newborn's condition.

---

[1]

Although Avery raised two additional claims in her complaint – negligent misidentification and breach of contract – she failed to respond to the hospital's summary judgment motion on these claims. As a result, I consider them to have been abandoned. *See, e.g., Botnick v. Zimmer, Inc.*, 2007 WL 1214156, at *5 (N.D. Ohio) (identifying as abandoned and granting defendant's summary judgment motion on those claims plaintiffs failed to address in their memorandum in opposition).

Avery refers in her opposition to the hospital's "spoliation of evidence," but does not raise such claim in her complaint. To the extent Avery in fact alleges spoliation by the hospital, I need not consider this claim, because a plaintiff may not raise a new claim in response to a defendant's summary judgment motion. *See, e.g., Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (citations omitted). At the summary judgment stage, a plaintiff may assert a new claim only by amending the complaint in accordance with Rule 15(a). *Id.* (citation omitted).

## A. November, 2004, Delivery

Avery alleges that her termination resulted from events taking place on and after November 5, 2004, when Avery and a second nurse assisted Bridget Heckler, a Certified Nurse Midwife, in a delivery complicated by shoulder dystocia.[2]

During the labor and delivery, an Electronic Fetal Monitor [EFM], a device placed around the mother's abdomen, continuously recorded the mother's contractions and the unborn baby's heart rate. The EFM records this information on a long piece of paper, or "strip," which Avery could annotate by typing in details about the labor and delivery at the precise time these events occurred.

The unborn baby's umbilical cord was wrapped around its neck. As a result, before delivering the baby, Heckler double-clamped and cut the cord. Avery recorded the time of this event as "17:30." At this point, the baby was without oxygen. After a few minutes (the number of which is unclear), Heckler delivered the baby, which was not breathing.

Avery's attention shifted at this point to the non-breathing baby. Avery, as a result, did not enter the delivery time into the EFM. Instead, about ten minutes after the delivery, Avery handwrote an estimated delivery time – "17:32" – on the EFM strip.

After the delivery, Heckler reviewed the EFM strip and labeled the last heart rate reading on the strip "maternal," indicating that that reading reflected the mother's – not the infant's – heart rate.

---

[2]

Shoulder dystocia is an "arrest of normal labor after delivery of the head by impaction of the anterior shoulder against the symphysis pubis." Stedmans Medical Dictionary (27th ed. 2000). One court described shoulder dystocia as a complication that can occur during a vaginal birth where the fetus' shoulders impede the fetus' passage through the birth canal after the head has been delivered. *Harrison v. United States*, 284 F.3d 293, 296 n.2 (1st Cir. 2002).

Several days after the delivery, Heckler complained to Wagner that Avery did not record the precise delivery time (likely resulting, according to Heckler, in an inaccurate patient record). Avery claims that Heckler deliberately mislabeled the heart rate reading as belonging to the mother. Avery asserts that this heart rate, which at one point dropped into the 60s, in fact belonged to the baby. Heckler also complained to Wagner that Avery had on a previous occasion given medical advice to one of Heckler's patients over the telephone about how to induce labor.

### B. Avery's Work Performance

The hospital claims that it rightfully terminated Avery for performance-related reasons. Wagner submits that Avery's work performance began to decline in the Fall of 2004, when Avery opened a day spa that she and her husband operated. Avery's co-workers complained to Wagner that Avery advertised her day spa business to hospital patients and used the hospital's telephone during work hours to manage the day spa.

On November 10, 2004, Wagner met with Avery to discuss these and other concerns about Avery's work performance. Wagner told Avery that Heckler was upset with Avery because of Avery's failure to have recorded the precise delivery time of the November 5, 2004, delivery. Wagner asked Avery whether Avery was confident that the times she recorded were accurate: whether the cutting of the umbilical cord took place at "17:30" and the delivery at "17:32." Avery insisted that her charting was accurate. At one point, Avery asked Wagner whether Wagner wanted Avery to change her charting: "Do you want me to lose the monitor strip? What do you want me to do?" Avery Dep. 62:15-16. Wagner indicated that she did not want Avery either to change her charting or to "lose" the monitor strip. *Id.* at 63:15-21.

4

Peggy Folk, the hospital's patient representative, informed Arthur Swain, the hospital's Vice President of Human Resources and HIPAA Compliance Officer, that she received a complaint on November 10, 2004, that Avery had disclosed confidential patient information to someone outside the hospital. Swain instructed Folk to investigate the complaint. Folk learned that Avery had called the emergency room to inquire whether a patient had been admitted with spinal meningitis. Avery claims she "feared she had been indirectly exposed and her patients would be at risk for infection." Compl. ¶ 12.

On November 20, 2004, Wagner learned that on one occasion, Avery lied about the reason she needed to cancel her work shift. Although Avery reported to her supervisors that she needed to miss work because she did not have a babysitter, Avery chose to work at the day spa instead of at the hospital.

In December, 2004, Swain and Wagner concluded that Avery's phone call to the emergency room violated both HIPAA and the hospital's patient confidentiality policy. Based on this call, as well as Avery's other performance problems,[3] Wagner and Swain jointly agreed to terminate Avery. Swain asserts that at the time of the termination decision, he had no knowledge of "any labor and delivery charting issues" relating to the November 5, 2004, delivery. Swain Aff. ¶ 7. Wagner terminated Avery on December 8, 2004.

## II. Standard of Review

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

[3] Avery's performance problems, as communicated by Wagner to Swain, included: advertising her day spa business to hospital patients, using the hospital's telephones during work hours to manage the day spa, providing medical advice to a patient over the telephone, and misrepresenting the reason she needed to cancel a work shift. Swain Aff. ¶ 8.

fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute

as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the party moving for summary judgment, the hospital bears the burden of showing the absence

of a genuine issue of material fact as to at least one essential element of Avery's claim. *See Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 324 (1986). In considering the hospital's motion for summary judgment, I must

accept Avery's evidence as true and draw all reasonable inferences in Avery's favor. *Id.* If, as the

nonmoving party, however, Avery fails to make a sufficient showing on an essential element of the case with

respect to which she has the burden, the hospital is entitled to summary judgment as a matter of law.

*Celotex*, 477 U.S. at 322-23.

### III. Discussion

### A. Wrongful Discharge in Violation of Public Policy

### 1. Elements of Claim

Generally, every employment relationship is terminable at the will of either party, and a discharge

without cause does not give rise to an action for damages. *Collins v. Rizkana*, 73 Ohio St. 3d 65, 67-68

(1995) (citations omitted). This has become known as the "employment-at-will" doctrine. *Id.* at 68.

In *Greeley v. Miami Valley Maint. Contractors, Inc.*, 49 Ohio St. 3d 228, 228 (1990),

*overruled in part by Tulloh v. Goodyear Atomic Corp.*, 62 Ohio St. 3d 541 (1992), however, the Ohio

Supreme Court recognized a public policy exception to the employment-at-will doctrine. The Court held

that an employee terminated in violation of a statute could sue his or her employer in tort for wrongful

discharge in violation of public policy. *Id*. The Court later expanded this tort, generally known as a

"*Greeley* claim," *Langley v. DaimlerChrysler Corp.*, 407 F. Supp. 2d 897, 907 (N.D. Ohio 2005), to encompass public policy embodied not only in statutes, but also in the Ohio and the United States Constitutions, administrative rules and regulations, and the common law. *See Painter v. Graley,* 70 Ohio St. 3d 377, 384 (1994).

A plaintiff bringing an action for wrongful discharge in violation of public policy must show: 1) a clear public policy, as manifested in the Ohio or United States Constitutions, statutes or administrative regulations, or common law (clarity element); 2) dismissal of an employee under circumstances that would jeopardize the particular public policy (jeopardy element); 3) conduct related to the public policy motivated the dismissal (causation element); and 4) the employer lacked an overriding legitimate business justification for the dismissal (overriding justification element). *Collins*, 73 Ohio St. 3d at 69-70 (citing H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-99 (1989)).

The clarity and jeopardy elements are questions of law, while the causation and overriding justification elements are questions of fact. *Collins*, 73 Ohio St. 3d at 70.

### 2. Basis for Avery's *Greeley* Claim

#### a. Ohio's Whistleblower Statute

Avery first contends that her *Greeley* claim is grounded in the policies underlying Ohio's whistleblower statute, O.R.C. § 4113.52. The hospital argues that because Avery did not strictly comply with that statute's requirements, she cannot maintain a cause of action for wrongful discharge in violation of the policy embodied in that statute.

7

The hospital is correct. Avery cannot maintain a wrongful discharge action based on the public policy embodied in O.R.C. § 4113.52 because Avery does not meet the requirements of that statute. *See Contreras v. Ferro Corp*., 73 Ohio St. 3d 244, 250-51 (1995).[4]

Section § 4113.52 requires an employee who, in the course of his or her employment, learns of a violation that the employer has the power to correct to take the following steps before filing a written report with a prosecuting authority: 1) orally notify his or her supervisor of the violation; 2) file with the supervisor a written report providing sufficient detail to identify and describe the violation; 3) give the employer twenty-four hours after the oral notification or receipt of the report (whichever is earlier) to correct (or make a good faith effort to correct) the violation. *See Contreras,* 73 Ohio St. 3d at 250-51 (employee failed to give employer oral notice, written report, and opportunity to correct violation before notifying outsiders).

An employee, moreover, must file a whistleblower action within 180 days after the date of the employer's retaliatory or disciplinary action. O.R.C. § 4113.52(D).

Because Avery failed to file a written report with the hospital and failed to bring her suit within 180 days after her termination, she did not comply with the whistleblower statute's requirements. Avery, as a result, cannot maintain an action for wrongful discharge in violation of the public policy embodied specifically within Ohio's whistleblower statute.

### b. Falsification of Medical Records

---

[4] In her opposition to the hospital's summary judgment motion, Avery cites several cases in which courts permitted plaintiffs to maintain a whistleblower *Greeley* claim despite the plaintiffs' failure to satisfy the requirements of the whistleblower statute itself. Avery's argument is addressed in Section b, *infra*.

To support her *Greeley* claim, Avery also relies on various sources that, according to Avery, establish a public policy against "[h]ospital employees intentionally altering or ordering subordinates to alter information contained in medical charts and records." Compl. ¶ 15. Avery identifies the following as sources of this public policy: O.R.C. § 2317.30 (witness oath), § 2921.11 (perjury), § 2921.13 (making false statements), and § 2923.03 (complicity); Ohio Admin. Code § 4723-4-06 (nursing safety standards); O. Evid. R. 603 (witness oath); and *Doyle v. Bethesda Hosp. Ass'n*, 1996 WL 752547, at *3 (Ohio App.) (recognizing Ohio's public policy against "alter[ing] information about patient care to avoid potential liability").

The factual predicate for Avery's claim that she was fired in violation of the public policies embodied in these provisions of Ohio law is that a supervisor asked her to falsify a hospital record. Avery's own testimony expressly contradicts this contention. During her deposition, Avery testified that no one asked her to falsify any medical records.[5]

---

[5]

Q: With respect to the electronic monitoring strip that was produced during the labor and delivery that was the subject of discussions with Diane Wagner, were you ever asked to change anything on that strip?
A: No.
Q: Were you ever asked by anyone to verify that the heart rate that was marked maternal by Bridget Heckler was the maternal heart rate or not?
A: That was [the] baby's heart rate.
Q: Were you asked?
A: I told that to Diane.
Q: You told Diane that?
A: Yeah.
Q: That it was the baby's heart rate?
A: That it was [the] baby's heart rate.
Q: Were you asked by Diane Wagner to say it was the maternal rate rather than the baby heart rate?
A: No. She told me it would be hard to prove it was the baby's heart rate.
Q: As I understand it, you weren't asked to change your charting or alter your charting in any respect

The hospital argues that, in light of this testimony, Avery alleges only that she was terminated because she *reported* Heckler's alleged mislabeling of the heart rate reading on the EFM strip. As a result, the hospital contends, Avery is invoking the public policy embodied in the whistleblower statute, and *not* public policies prohibiting the falsification of medical records. Among the sources of public policy Avery cites, only the whistleblower statute specifically prohibits an employer from retaliating against an employee for reporting a violation of the law. Thus, according to the hospital, Avery may only rely on the whistleblower statute to support her *Greeley* claim. Because Avery, the hospital argues, did not satisfy the elements set forth in the whistleblower statute, her *Greeley* claim cannot proceed based on that statute or any other public policy source she cites.

The hospital is correct. Ohio courts hold that a *Greeley* plaintiff may rely only on the public policy embodied in Ohio's whistleblower statute where: 1) the essence of the plaintiff's claim is that an employer must not be allowed to retaliate against an employee who reports violations of the law, and 2) other public policy sources on which the *Greeley* plaintiff relies do not specifically prohibit such employer retaliation.

---

by Diane Wagner?

A: No.

Q: And you weren't asked to substantiate Bridget Heckler's entry on the strip that that was maternal; you were not asked to substantiate that that was, in fact, the case?

A: I don't understand what you're saying.

Q: As I understand it, Bridget Heckler wrote "maternal" on a heart rate that was actually the baby's.

A: Right.

Q: Were you asked by anyone at the hospital to back of Bridget Heckler and state that that was the maternal heart rate?

A: No.

Q: Were you asked by anyone at the hospital to change that from maternal to fetal heart rate?

A: No.

Avery Dep. 92:2-93:18.

*See, e.g., Celeste v. Wiseco Piston*, 151 Ohio App. 3d 554 (2003);[6] *Evans v. PHTG, Inc.*, 2002 WL 1401476 (Ohio App.);[7] *Davidson v. BP Am., Inc.*, 125 Ohio App. 3d 643 (1997).[8]

---

[6]

In *Celeste*, the plaintiff alleged that he was terminated because he complained that the motorcycle engines his employer manufactured were unsafe. The plaintiff brought a *Greeley* claim against his former employer, but his complaint failed to identify the specific public policy on which the plaintiff relied.

The trial court granted the defendant's motion to dismiss on the ground that the plaintiff, who acknowledged in his opposition to the motion to dismiss that he was invoking the public policy embodied in Ohio's whistleblower statute, had failed to comply with the whistleblower statute's requirements. The Ohio Appeals Court reversed, noting that a trial court must examine a plaintiff's complaint to determine if the plaintiff is entitled to relief on any possible theory. The Court concluded that the plaintiff's claim could be based on Ohio's Product Liability Act, a source of public policy separate from the public policy contained in the whistleblower statute. 151 Ohio App. 3d at 561.

[7]

In *Evans*, a secretary brought a *Greeley* claim against her former employer, a hair transplant clinic, for allegedly terminating her for reporting to her superior that an unlicensed employee performed a medical procedure on a clinic patient. In asserting her *Greeley* claim, the secretary attempted to rely on a statute criminalizing the unlicensed practice of medicine or surgery.

The court agreed that this statute reflected Ohio's clear public policy against allowing unlicensed professionals to practice medicine. The court noted, however, that the "essence" of the secretary's claim was "that the public policy of [Ohio] encourages employees to report criminal conduct occurring in the workplace to their employers." 2002 WL 1401476, at *5. Because the statute did not specifically prohibit an employer from terminating an employee who reports the unauthorized practice of medicine or surgery to a supervisor, the court concluded that the secretary "failed to identify a source of public policy other than [Ohio's whistleblower statute] to support her *Greeley* claim." *Id.* at *6.

[8]

In *Davidson,* the court concluded that the appellant, who cited several different public policies to support his *Greeley* claim, was in fact relying on the public policy underlying the whistleblower statute. As a result, pursuant to the rule articulated in *Contreras*, the appellant needed to satisfy the requirements of the whistleblower statute itself. The court explains as follows:

> As the basis for his public policy claims, appellant relies on the public policy to enforce criminal laws, the public policy in favor of the tax code, the public policy to encourage reports of criminal conduct, the public policy against discharging employees who insist on compliance with the law, and the public policy against discharging employees in order to prevent disclosure of unlawful conduct as the basis for his claim. Succinctly, appellant

The cases on which Avery relies in arguing that Ohio courts permit plaintiffs to bring *Greeley* claims even where the plaintiffs have not satisfied the elements of Ohio's whistleblower statute are distinguishable. In each of the cases Avery cites, the court concluded that the plaintiff bringing a *Greeley* claim relied on a public policy other than that embodied in the whistleblower statute. *See, e.g., Anders v. Specialty Chem. Res., Inc.*, 121 Ohio App. 3d 348, 357 (1997) (*Greeley* claim rested on criminal statutes and/or nonstatutory public policy); *Doyle,* 1996 WL 752547, at *3 (*Greeley* claim rested on Ohio's public policy against "alter[ing] information about patient care to avoid potential liability.").

In *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St. 3d 77 (2002) and *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134 (1997), the plaintiffs relied on Ohio public policy favoring workplace safety, which the Ohio Supreme Court had concluded in *Kulch* was an independent basis upon which a *Greeley* claim may rest. In contrast, Avery, whose claim is predicated on an allegation that Heckler requested that Avery falsify medical records (a contention that Avery herself contradicts), does not rely on a public policy other than that contained in the whistleblower statute.

### 3. Jeopardy

Even if Avery were able to proceed with a *Greeley* claim by successfully identifying "a source of public policy separate from the public policy embodied in [Ohio's whistleblower statute]," *Celeste*, 151

---

claims that he was discharged for attempting to report the criminal conduct of unlawful tax improprieties and that, in Ohio, there is public policy against discharging him for attempting to do so. A clear expression of these public policies upon which appellant relies is manifest in the scope of the Whistleblower Act, R.C. 4113.52. . . . [A]ppellant, here, is limited to bringing his claim for tortious wrongful discharge in violation of public policy pursuant to the requirements of the Whistleblower Act, R.C. 4113.52.

125 Ohio App. 3d at 650.

12

Ohio App. 3d at 560 (citations omitted), Avery could not establish either the jeopardy or causation elements of either that claim or her whistleblower-based *Greeley* claim.

To prove that dismissing employees under circumstances like those involved in her dismissal would jeopardize a particular public policy, Avery must prove that her statement to Wagner would put a reasonable employer on notice that Avery was invoking a governmental policy as the basis of her complaint. *See Jermer v. Siemens Energy & Automation, Inc.,* 395 F.3d 655, 656 (holding that an employee's discharge resulting allegedly from statements he made about air quality in the workplace did not jeopardize Ohio's public policy in favor of workplace safety because the employee "never connected his statements about air quality to governmental policy or mentioned or in any way invoked governmental policy as the basis of his complaint."). The court explained:

> The "jeopardy" element does not state simply that the policy has been violated, but that the policy itself is at risk if dismissals like the one in question are allowed to continue. The Ohio Supreme Court views employee complaints and whistleblowing as critical to the enforcement of the State's public policy, and the Court therefore intended to make employees de facto "enforcers" of those policies. Toward this end, the Court granted them special protection from Ohio's generally applicable at-will employment status when the employees act in this public capacity. In exchange for granting employees this protection, employers must receive notice that they are no longer dealing solely with an at-will employee, but with someone who is vindicating a governmental policy. Employers receive clear notice of this fact when actual government regulators arrive to audit or inspect. They should receive some similar notice when an employee functions in a comparable role. Even though an employee need not cite any specific statute or law, his statements must indicate to a reasonable employer that he is invoking governmental policy in support of, or as the basis for, his complaints.

*Id.* at 659.

Here, a reasonable employer would not be put on notice that Avery, during her conversation with Wagner, was invoking policies either under the whistleblower statute or against falsification of medical records.

Avery's "report" to Wagner occurred during their meeting about Avery's job performance problems. After Avery learned that Heckler was upset with Avery's charting of the November 5, 2004, delivery, Avery informed Wagner of Heckler's alleged mislabeling of a medical record. To satisfy the jeopardy requirement, Avery need not have cited any statute, nursing regulation, or hospital rule prohibiting Hecker's conduct, nor need Avery have "be[en] certain that a particular law ha[d] been abridged." *Id.* Nonetheless, it could not be clear to a reasonable employer that Avery was "acting not only for [her]self, but also for the public at large." At no point did Avery suggest that Heckler's behavior contravened any public policy or hospital rule. A reasonable employer would assume that Avery was defending herself by disagreeing with Heckler's description of the events, not accusing Heckler of any malfeasance. Avery never "connected" her description of Heckler's behavior to any governmental policy. Thus, Avery could not establish the jeopardy element of a *Greeley* claim.

### 4. Causation

Likewise, Avery could not establish the causation element of a *Greeley* claim. In *Herlik v. Cont'l Airlines, Inc*., 2005 WL 2445947, at *4 (6th Cir. 2005), the Sixth Circuit held that a probationary pilot failed to establish that his safety complaints triggered his termination where there was no evidence that the supervisor responsible for the termination decision knew of the pilot's complaints.

In this case, Swain, who was jointly responsible with Wagner for Avery's termination, asserts that at the time he and Wagner decided to terminate Avery, he had no knowledge of any charting issues arising from the November, 2004, labor and delivery. Swain Aff. ¶ 7. Avery points to no evidence contradicting

14

Swain's statement.[9] Thus, Avery cannot establish that her conversation with Wagner regarding Heckler's alleged mislabeling of the heart rate reading caused the joint decision-makers, Wagner and Swain, to decide to terminate Avery.

Moreover, Avery relies substantially on temporal proximity to establish a causal link between her "report" to Wagner of Heckler's mislabeling of the monitor strip and her subsequent termination. But "temporal proximity alone is generally insufficient to establish causality."[10] *Herlik*, 2005 WL 2445947, at *4 (citing *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987); *Pflanz v. Cincinnati*, 149 Ohio App. 3d 743, 764 (2002)) ("[T]he mere fact that an adverse employment action occurs subsequent to the protected activity does not alone support an inference of retaliation."). Avery cannot establish

---

[9]

In response to Swain's unequivocal denial that he had any knowledge of the charting issues when he and Wagner decided to terminate Avery, Avery offers only speculation. Avery argues that "something as important as Avery's allegedly erroneous time of delivery in the 'difficult shoulder dystocia birth'" surely would have been discussed by Wagner and Swain. Pl.'s Resp. to Def.'s Mot. for Summ. J. 8. Avery also indicates that the date on which Swain signed Avery's termination document – December 9, 2005 – "cause[s] concern about [the] Defendant's credibility." *Id.* Such speculation by Avery is insufficient to withstand a summary judgment motion. *See, e.g., Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

[10]

Q: In your lawsuit, your claim, as I understand it, you believe you were terminated as a result of the documentation relating to the labor and delivery that we talked about?
A: Uh-huh.
Q: Why do you believe that your termination was motivated in whole or in part by that documentation?
A: Well, several reasons. I had worked there for a long time. I had never gotten anything but good performance reviews. I worked well and played well with others. . . . Before that delivery, I went to work, people where happy to see me. . . . The whole unit changed after that delivery. They took away magazines. They took away computer games. It may not have anything to do with it. Up until that delivery my standing was fine and dandy. Many people have gotten counseled or written up for various things and have maintained their employment. This delivery pissed Bridget off.

Avery Dep. 93:19-95:5.

causation merely by alleging that she perceived a marked change in her standing among her co-workers after the November, 2004, delivery and her conversation with Wagner. Thus, even if Avery could rest her *Greeley* claim on a public policy embodied either in the whistleblower statute or elsewhere in Ohio law, she could not establish that her termination was triggered by her "report" to Wagner of Heckler's behavior.

### B. Intentional Infliction of Emotional Distress

Avery argues that by wrongfully terminating her for a "false HIPPA violation," Compl. ¶ 19, the hospital is liable to her for intentional infliction of emotional distress. The hospital, Avery claims, exposed her to civil fines, criminal penalties, and a "permanent record of . . . false allegations," Compl. ¶ 20, thereby causing her to suffer financial loss, reduction in earning capacity, damage to reputation, humiliation, emotional anguish, and attorney's fees.

To bring a claim for intentional infliction of emotional distress, a plaintiff must establish: 1) the defendant intended to cause emotional distress, or knew or should have known that the actions taken would result in serious emotional distress; 2) the defendant's conduct was extreme and outrageous; 3) the defendant's actions proximately caused plaintiff's psychic injury; and 4) the mental anguish the plaintiff suffered was serious. *Hanly v. Riverside Methodist Hosp.*, 78 Ohio App. 3d 73, 82 (1991) (citing *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34 (1983)).

A former employee generally may not recover damages from his or her previous employer for intentional infliction of emotional distress allegedly caused by the employee's discharge from his or her at-will employment. *Vickers v. Wren Indus.,* 2005 WL 1685101, at *13 (Ohio App.) (citing *Foster v. McDevitt*, 31 Ohio App. 3d 237, 237 (1986)); *Breitenstein v. City of Moraine*, 1992 WL 317444, at *6 (Ohio App) (holding that mere fact that appellant was terminated from his employment, without more,

cannot rise to the level of extreme and outrageous conduct necessary to prove intentional infliction of emotional distress).

Because the hospital did no more than "insist upon [its] legal rights in a permissible way," *Mason v. U.S. Fid. & Guar. Co.*, 69 Ohio App. 3d 309, 317 (1990) (internal quotation marks and citation omitted), and because Avery has failed to demonstrate a genuine issue of fact as to whether the hospital's conduct was "in excess of its privilege," *id.*, Avery's claim for intentional infliction of emotional distress must fail.

Moreover, Avery has not established that she suffered severe mental anguish as a result of her termination. Avery acknowledged that she had no psychological or medical condition that prohibited her from pursuing another job after her termination. Avery Dep. 96: 10-13. She continued to work at the spa and "loved it," *id.* at 98:13, and she had a "great" family situation, *id.* at 98:17. As a result, the hospital is entitled to summary judgment on Avery's claim for intentional infliction of emotional distress.

### C. Fraud

Avery argues that, during the meeting in which Wagner informed Avery of Wagner's and Swain's joint termination decision, the hospital fraudulently accused Avery of violating HIPAA. Avery claims that in reliance on the hospital's intentional misrepresentation, she signed a document acknowledging her HIPAA violation.

To establish a fraud claim, a plaintiff must prove: 1) a representation or, where there is a duty to disclose, concealment of a fact; 2) that is material to the transaction at hand; 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable

17

reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance. *Russ v. TRW, Inc.*, 59 Ohio St. 3d 42, 49 (1991) (citations omitted).

Under Ohio law, a representation about the law is an opinion and generally cannot form the basis of a fraud action. *Lynch v. Dial Fin. Co. of Ohio No. 1, Inc.*, 101 Ohio App. 3d 742, 750 (1995) (citations omitted). Avery, moreover, is "presumed to know the law and is bound to take notice of the law and, therefore . . . cannot be deceived by representations concerning the law," *Equal Justice Found. v. Deutsche Bank Trust Co. Americas*, 412 F. Supp. 2d 790, 795 (S.D. Ohio 2005) (citing Williston on Contracts, § 69:10 (4th ed. 2004)). Thus, Avery cannot base her fraud claim on the hospital's opinion that she violated HIPAA.[11]

## IV. Conclusion

For the foregoing reasons, it is therefore

ORDERED THAT defendants' motion for summary judgment be, and the same hereby is granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

---

[11]

Because Avery's fraud claim fails, I need not decide whether she is entitled to punitive damages.

18